Slip Op. 13-24

UNITED STATES COURT OF INTERNATIONAL TRADE

FOSHAN SHUNDE YONGJIAN
HOUSEWARES & HARDWARES CO.,
LTD.,

                    Plaintiff,

          v.

UNITED STATES,

                    Defendant.

Before: Leo M. Gordon, Judge

Court No. 12-00069

## OPINION and ORDER

[Final results of administrative review sustained in part; remanded in part; and stayed in part.]

Dated: February 22, 2013

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, DeKieffer & Horgan of Washington, DC for Plaintiff Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.

Carrie A. Dunsmore, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were Stuart F. Delery, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Nathaniel J. Halvorson, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce of Washington, DC.

Frederick L. Ikenson, Blank Rome LLP of Washington, DC for Defendant-Intervenor Home Products International, Inc.

Gordon, Judge: This action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering Floor-Standing, Metal-Top Ironing Tables from China. See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 77 Fed. Reg. 14,499 (Dep't of Commerce Mar. 12, 2012) (final results admin. review) ("Final

Results"); <u>see also</u> Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review of Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, A-570-888 (Mar. 5, 2012), available at http://ia.ita.doc.gov/frn/summary/PRC/2012-5915-1.pdf (last visited this date) ("<u>Decision Memorandum</u>").   The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).

Before the court is the motion for judgment on the agency record of Plaintiff Foshan Shunde Yongjian Housewares and Hardwares Co. ("Foshan Shunde") challenging Commerce's (1) surrogate country selection, (2) steel wire input surrogate valuation, (3) financial statement selection for calculating surrogate financial ratios, (4) brokerage and handling surrogate value calculation, and (5) zeroing methodology. Because Commerce's financial statement selection and brokerage and handling issues are similar to issues being addressed in litigation involving a prior administrative review, the court is staying the disposition of those issues pending a final decision in that litigation.  Likewise, the zeroing issue is presently before the U.S. Court of Appeals for the Federal Circuit, and the court is staying disposition of the zeroing issue pending guidance from the Court of Appeals.  As for the remaining issues, the court sustains Commerce's surrogate country selection, but remands the issue of the steel wire input surrogate valuation to Commerce for further consideration.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2012).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2012).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Surrogate Country Selection

On September 29, 2010, Commerce initiated an administrative review covering Foshan Shunde for the August 1, 2009 through July 30, 2010 period of review ("POR"). See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 75 Fed. Reg. 60,076 (Dep't of Commerce Sept. 29, 2010).  On May 4, 2011, Commerce extended the deadline for the preliminary results of review until August 31, 2011.  See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 76 Fed. Reg. 25,301 (Dep't of Commerce May 4, 2011) (extension for prelim. results).  Commerce issued its original antidumping questionnaire to Foshan Shunde on October 4, 2010, to which Foshan Shunde responded to sections A, C, and D on November 12, 2010, November 19, 2010, and November 30, 2010, respectively.  Petitioner, Home Products International, Inc. ("HPI"), filed comments on Foshan Shunde's sections A, C, and D responses on January 12, 2011, May 17, 2011, July 8, 2011, and July 28, 2011.  Commerce then issued supplementary questionnaires to Foshan Shunde on March 30, 2011, June 2,

2011, and July 13, 2011.  Foshan Shunde responded to each of these supplemental requests on May 2, 2011, June 23, 2011, and July 29, 2011.

On June 8, 2011, Commerce issued its Surrogate Country List containing six countries that Commerce determined to be economically comparable to China based on their Gross National Income (GNI) as published in the World Bank's 2011 <u>World Development Report</u>.  The six countries listed were the Philippines, Indonesia, Ukraine, Thailand, Columbia, and South Africa—but not India.  <u>See</u> Memorandum from Carole Showers to Richard Weible, Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty Order on Floor-Standing, Metal-Top, Ironing Tables and Parts Thereof from the People's Republic of China ("PRC"): Surrogate Country List (June 8, 2011) ("Surrogate Country List").  On June 10, 2011, Commerce emailed its Surrogate Country List to the interested parties.  <u>See</u> <u>Floor Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China</u>, 76 Fed. Reg. 55,357 (Dep't of Commerce Sept. 7, 2011) (prelim. results) ("<u>Preliminary Results</u>").  Subsequently, on July 8, 2011, HPI submitted Indonesian financial statements for suggested valuation of factors of production ("FOP"), while on July 22, 2011, Foshan Shunde submitted Indian financial statements for FOP valuation. <u>See</u> <u>Preliminary Results</u>.

On September 7, 2011, Commerce published its preliminary results where it selected Indonesia as the surrogate country for valuing the factors of production.  <u>See</u> <u>Preliminary Results</u>.  In the <u>Final Results</u>, published on March 12, 2012, Commerce affirmed its decision to use Indonesia as the surrogate country and assigned Foshan

Shunde an antidumping duty margin of 43.47 percent.   See Final Results. Foshan

Shunde then commenced this action.

### 1. Reasonableness of Commerce's Surrogate Country Selection

### a. Parties' Contentions

Foshan Shunde argues that Commerce's selection of Indonesia as the surrogate

country for FOP valuation is unreasonable (unsupported by substantial evidence) and

that Commerce should have instead selected India.   Plaintiff claims that Commerce

"violated its Policy Bulletin 04.1 by waiting 252 days [after the start of the administrative

review] to determine the list of countries it deemed economically comparable to China"

and that this "tardy release of potential surrogate countries . . . has severely prejudiced

Foshan Shunde . . . because the list did not include India by reason of [Commerce's]

tardiness."  Pl.'s R. 56.2 Mot. for J. upon the Agency R. at 8, ECF No. 27 ("Pl.'s Br.").

Foshan Shunde further contends that "principles of fairness prevent [Commerce] from

changing its approach at such a late stage when a respondent reasonably relied on

[Commerce's] approach in every other 2009-2010 review."  Id. (citing Shikoku Chems.

Corp. v. United States, 16 CIT 382, 388, 795 F. Supp. 417, 422 (1992).  Plaintiff argues

that it had no notice that India would not be on the Surrogate Country List, and that it

has been:

> unreasonably disadvantaged . . . because all of its U.S. pricing for the
> POR had been predicated on [Commerce's] 25 years of past practice and
> [Commerce's] practice in the prior six segments (investigation plus five
> reviews) in which India was selected not only for a place on the list of
> economically comparable countries but . . . as the surrogate country.

Pl.'s Br. at 9.  Foshan Shunde maintains that "[b]y removing India from consideration after the pricing period for the POR, [Commerce] unlawfully and unreasonably denied Foshan Shunde the ability to reasonably appreciate its costs, and, in turn, its ability to set prices to avoid dumping . . . ." Id. at 10.

Next, Foshan Shunde argues that "even if India properly was not listed within the . . . band of most economically comparable countries . . ., [Commerce] was obligated to consider whether India was nonetheless a more appropriate source than the listed countries." Id. at 5.  Plaintiff explains that Commerce placed too much emphasis on GNI, and that it should have focused more on which country was a significant producer. In contrast to Indonesia, Foshan Shunde contends that India is both a major steel producer and a significant producer of the subject merchandise.  Id. at 17-18 ("India is home to several substantial public producers of ironing tables. . . . The record reflects that there is no ironing board producer in Indonesia.").  It adds that Commerce's practice has been to use multiple countries in calculating the factors of production ("FOP").  Id. at 20 (citing Chlorinated Isocyanurates from the People's Republic of China, 77 Fed. Reg. 41,746, 41,748-49 (Dep't of Commerce July 16, 2012) (prelim. results admin. rev.); High Pressure Steel Cylinders from the People's Republic of China, 77 Fed. Reg. 26,739 (Dep't of Commerce May 7, 2012) (final determ. of sales at LTFV).

Defendant responds arguing that Commerce followed its established practice of choosing a country based on (1) GNI relative to China, (2) whether the country was a significant producer of comparable merchandise, and (3) the availability of surrogate values within the selected country.  Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. at

4, ECF No. 32 ("Def.'s Br.") (citing <u>Decision Memorandum</u> at 10).   Defendant further

contends that Commerce's "approach is consistent with [Commerce's] regulations

(19 C.F.R. § 351.408(b)), with Policy Bulletin No. 04.1, and with the approach employed

by [Commerce] in all proceedings that involve NMEs, including past reviews of this

case."   <u>Decision Memorandum</u> at 10 (citation omitted).   Defendant argues that, in

following this approach, Commerce's selection of Indonesia as the surrogate country

was reasonable.

As to Foshan Shunde's claim that Commerce should have relied on other

countries, Defendant counters that the facts did not warrant seeking data from other

countries because Commerce found Indonesia to be a significant producer of

comparable merchandise and to possess reliable sources of publicly available surrogate

value data.  Def.'s Br. at 7 (citing <u>Decision Memorandum</u> at 6).

Defendant also maintains that Commerce's determination regarding "what

constitutes the best available information is largely within the agency's discretion," and

the court's role is "not to evaluate whether the information Commerce used was the best

available, but rather whether Commerce's choice of information is reasonable."  Def.'s

Br. at 5-6 (citing <u>Nation Ford Chem. Co. v. United States</u>, 166 F.3d 1373, 1377 (Fed.

Cir. 1999); <u>Peer Bearing Co.-Changshan v. United States</u>, 27 CIT 1763, 1770, 298 F.

Supp. 2d 1328, 1336 (2003)).

As to the timing of the surrogate country decision, Defendant argues that Foshan

Shunde was not prejudiced and that Plaintiff mischaracterizes the selection of Indonesia

as a "late change" and "unfair surprise."   Def.'s Br. at 9 (citing Pl.'s Br. at 8-9).

Defendant also disputes Foshan Shunde's claim of insufficient notice and stresses that the same administrative review cited by Foshan Shunde in support of its arbitrary and capricious argument, Certain Steel Nails from the People's Republic of China, provides such notice.  Def.'s Br. at 10 (citing Decision Memorandum at 12 (citing Petitioner's rebuttal brief and the Surrogate Country List)); see also Certain Steel Nails from the People's Republic of China, 76 Fed. Reg. 56,147 (Dep't of Commerce Sept. 12, 2011) (prelim. rescission and partial revocation of new shipper review) ("Steel Nails").  In Steel Nails, Commerce stated "the disparity in per capita GNI between India and China has consistently grown in recent years, and should this trend continue, [Commerce] may determine in the future that the two countries are no longer 'at a comparable level of economic development.'"  Id.  Defendant denies any patent unfairness in Commerce's scheduling of the proceedings because as Commerce stated "Foshan Shunde was . . . afforded several months to comment on the methodology used . . . to identify the primary surrogate country, and to submit value information."  Decision Memorandum at 11.  Finally, Defendant states that Foshan Shunde "oddly suggest[s]" that it would have reported FOPs differently had it known which surrogate country would be selected because it was required to report accurate FOPs—irrespective of the surrogate country. Def.'s Br. at 9.

Defendant-Intervenor supports Defendant's arguments.  Additionally, Defendant-Intervenor disagrees with Foshan Shunde's claim that Commerce should have selected India because it is a producer of identical merchandise whereas Indonesia is a producer of comparable merchandise.  Defendant-Intervenor argues that the statute, 19 U.S.C.

§ 1677b(c)(4) imposes no hierarchy between producers of identical versus comparable merchandise. Def.-Intv.'s Resp. to Pl.'s Mot. for J. on the Agency R. at 5, ECF No. 32 ("Def.-Intv.'s Br.") (citing Jiaxing Brother Fastener Co. v. United States, 34 CIT ___, ___, 751 F. Supp. 2d 1345, 1352-53 (2010)).

## b. Analysis

In determining whether merchandise is being sold at less than fair value, Commerce compares the export price or constructed export price and normal value ("NV"). 19 U.S.C. § 1677b(a). Generally, Commerce calculates a non-market economy's NV using data from surrogate countries to value the factors of production. See Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1381 (Fed. Cir. 2001). When valuing these factors of production, Commerce must use the "best available information" in selecting surrogate data from "one or more" surrogate market economy countries. 19 U.S.C. § 1677b(c)(1), (4). The statute provides that Commerce must base its surrogate country selection on, to the extent possible, whether that country is economically comparable to the non-market economy, and whether it is a significant producer of comparable merchandise. 19 U.S.C. § 1677b(c)(4). Under its regulations, Commerce will normally, "use publicly available information" and "value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(1), (2).

Commerce employs a four-step process to select the surrogate country. First, Commerce compiles a list of countries that are at a level of economic development comparable to the country being investigated. U.S. Department of Commerce, Import

Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection

Process at 2 (Mar. 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html (last

visited this date) ("Policy Bulletin").  Commerce then ascertains which, if any, of those

countries produce comparable merchandise.  Id.  Next, from the resulting list of

countries, Commerce determines, which, if any, of the countries are significant

producers of comparable merchandise.  Finally, Commerce evaluates the quality, i.e.,

the reliability and availability, of the data from those countries.  Id. at 3. "Upon review of

these criteria, Commerce chooses the country most appropriate for use as a surrogate

for the [review]."  Dorbest Ltd. v. United States, 30 CIT 1671, 1679, 462 F. Supp. 2d

1262, 1271 (2006).

Commerce followed this approach in finding that Indonesia was the most

appropriate surrogate country and explained:

> In selecting Indonesia, we adhered to our established practice which is to
> base the surrogate country on (1) GNI, relative to that of [China];
> (2) whether that country is a significant producer of comparable
> merchandise; and (3) the availability of surrogate values within the
> selected country.
>
> The Department determines economic comparability on the basis of per
> capita gross national income (GNI).  See 19 CFR 351.408(b), and Policy
> Bulletin No., 04.1.  Based on the most current data available from the
> World Bank (World Development Report 2011), the Department,
> determines that Indonesia, with a GNI of 2,230 USD has a GNI that is
> proximate to that of [China] . . ., which has a GNI of 3,590 USD. Moreover,
> we continue to find that Indonesia is a significant producer of comparable
> merchandise.  Ironing tables are currently classifiable under U.S.
> Harmonized Tariff Schedule item 9403.20.0011 which is classified as a
> specific type of "household metal furniture" and falls within the
> international subheading 9403.20 ("Other metal furniture").   During the
> [PO]R Indonesia exported merchandise within the category 9403.20 which
> we view as a "comparable product" within the meaning of Policy Bulletin
> No., 04.1.  See, e.g., Amended Final Results of Antidumping Duty

> Administrative Review and New Shipper Reviews: Wooden Bedroom
> Furniture From the People's Republic of China, 72 FR 46957 (August 22,
> 2007), and accompanying Issues and Decision Memorandum, at Cmt. 1, 5
> Petitioner July 8, 2011 submission at Exhibit 1.   Finally, we found
> Indonesia had sufficient available data from which to value the factors of
> production for these final results, as the Department was able to obtain
> surrogate values for all the factors of production from Indonesia.

Decision Memorandum at 5-6.

First, Commerce examined the GNIs, relative to that of China, by relying on the

following 2011 World Bank data:

| Country | GNI (USD) | Relative to China (%) |
|---|---|---|
| China | $3,590 | 100.0% |
| South Africa | $5,770 | 160.7% |
| Columbia | $4,930 | 137.3% |
| Thailand | $3,760 | 104.7% |
| Ukraine | $2,800 | 78.0% |
| **Indonesia** | **$2,230** | **62.1%** |
| Philippines | $1,790 | 49.9% |
| **India** | **$1,180** | **32.9%** |

Def.-Intv.'s Br. at 3 (citing Decision Memorandum, cmt. 1 at 4).  Because of a two year

lag, the World Bank's 2011 publication represents data from 2009, which is more

contemporaneous with the POR than the 2010 report.  Decision Memorandum at 6.

The record demonstrates that Indonesia was economically comparable to China—and

that India was not.  The data reveals that China had a GNI of $3,590, Indonesia had a

GNI of $2,230 (62.1% of China's GNI), and India had a GNI of $1,180 (32.9% of China's

GNI).  It also shows that Indonesia's GNI is almost twice India's, rendering it reasonable

for Commerce to have selected Indonesia, and not India, as the surrogate country.

Similarly, since India had the lowest GNI of the above listed countries and was therefore

the least economically comparable to China, it was reasonable for Commerce not to

have included India in the Surrogate Country List.

Second, Commerce found Indonesia to be a significant producer of comparable

merchandise.  Although Foshan Shunde argues that Commerce should have selected

India because it is a producer of identical merchandise while Indonesia only produces

comparable merchandise, the court agrees with Defendant-Intervenor that the statute,

19 U.S.C. § 1677b(c), does not distinguish between identical and comparable

merchandise.  Jiaxing Brother Fastener Co. v. United States, 34 CIT ___, ___, 751 F.

Supp. 2d 1345, 1353 (2010) (There is "no support for any preference between identical

versus comparable merchandise.").  Accordingly, it was reasonable for Commerce to

determine that Indonesia satisfied the second requirement of being a significant

producer of comparable merchandise.  Last, there is no dispute that Indonesia fulfilled

the third requirement of availability of surrogate values within the selected country.

Since all the requirements for surrogate country selection were met, it was reasonable

for Commerce to select Indonesia as the most appropriate surrogate country for this

review.

Foshan Shunde next claims detrimental reliance from Commerce's "late change"

and "unfair surprise" in the procedural timing of the surrogate country selection.  Pl.'s Br.

at 8-9.  The court agrees with Defendant in finding this claim meritless.  Foshan Shunde

relies on <u>Shikoku Chems. Corp. v. United States</u>, 16 CIT 382, 388, 795 F. Supp. 417, 421 (1992) that states "[p]rinciples of fairness prevent Commerce from changing its methodology at this late stage."   However, there was no change in methodology in determining the surrogate country here.   In contrast, <u>Shikoku</u> involved a change to the method of calculating the repacking expenses—and <u>not</u> a change in outcome based on the <u>same</u> calculations methodology.   <u>Id.</u>   What has changed here are the underlying facts, not the method.   As Defendant correctly explained:

> for 25 years, Commerce selected a surrogate country according to the same methodology it used in this case, that is, selecting a primary surrogate country based on economic comparability.   That the economies of India and China are no longer comparable is a factual, evidentiary matter, supported by substantial record evidence.   Foshan Shunde was unreasonable to assume that economies remain static over a 25 year period of time.

Def.'s Br. at 9.   Commerce foreshadowed the shift from India to Indonesia in <u>Steel Nails</u>. The court therefore is not persuaded that Foshan Shunde was "unfairly" surprised.

The court also disagrees that Commerce violated Policy Bulletin 04.1 by not requesting the creation of the surrogate country list "early in a proceeding" and that this "tardiness" prejudiced Foshan Shunde.   Pl.'s Br. at 5 (citing Policy Bulletin 4.1), 8.   The Surrogate Country List was issued on June 8, 2011, almost three months before the September 7, 2011 <u>Preliminary Results</u>, and prior to Foshan Shunde's June 23, 2011 and July 29, 2011 responses to the supplemental questionnaires.   Under these circumstances, Foshan Shunde had ample opportunity to challenge Commerce's selection of Indonesia as the surrogate country.   Accordingly, Commerce's timing in issuing the Surrogate Country List was reasonable.

For the foregoing reasons, Commerce's surrogate country selection is reasonable and is therefore sustained.

## 2. APA Claim of Notice and Comment

### a. Parties' Contentions

Foshan Shunde contends that Commerce's surrogate country selection is unlawful because it did not provide an opportunity for notice and comment pursuant to Section 553(c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (2006). Plaintiff argues that "[r]emoving India from the list was in fact per se one of the most significant acts of rulemaking by the Department in 25 years, requiring notice and comment."  Pl.'s Br. at 10 (citing 5 U.S.C. § 553(c)).

Defendant responds that surrogate country selection is a factual determination, not a policy or practice, and therefore not within the gamut of rule making to which notice and comment attaches pursuant to Section 553.  Def.'s Br. at 10 (citing GSA, S.R.L., v. United States, 23 CIT 920, 931, 77 F. Supp. 2d 1349, 1359 (1999) (stating that "the APA does not apply to antidumping administrative proceedings.").  Defendant argues that the "decision not to include India on the list of potential surrogate countries in these final results does not represent a change in methodology, but rather a change in result based on the record evidence present in this administrative review."  Def.'s Br. at 10 (citing Decision Memorandum at 12).  Defendant maintains that the APA's notice and comment requirement are not applicable as "this determination fits squarely within the province of the agency's discretion to weigh the evidence and make factual findings."  Id. at 10.  Defendant-Intervenor echoes Defendant's arguments by stating,

"there was no change in rule; no change in policy; not even a change in methodology. There was only a change in result, as a consequence of a change in facts (GNI)."  Def.-Intv.'s Br. at 6.

### b. Analysis

The court agrees with Defendant and Defendant-Intervenor that Foshan Shunde was not unlawfully denied an opportunity for notice and comment pursuant to 5 U.S.C. § 553.  Foshan Shunde claims that the Indonesian selection as the surrogate country was "per se one of the most significant acts of rulemaking by the Department in 25 years, requiring notice and comment . . . ."  Pl.'s Br. at 10.  The court disagrees. Section 553 of the APA requires agencies to give interested parties notice and an opportunity to comment on proposed rule making.  Rule making is defined as the "agency process for formulating, amending, or repealing a rule," and a rule is further defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ."  5 U.S.C. § 551(4), (5). The surrogate country determination made during the administrative proceeding was an investigative, factual determination based on existing policies and regulations—not an implementation of a new policy or practice.  Because the surrogate country selection does not constitute "rule making," Section 553 and its notice and comment requirements are inapplicable.  See JTEKT Corp. v. United States, 35 CIT ___, ___, 768 F. Supp. 2d 1333, 1347 (2011) (rejecting Plaintiff's argument that Commerce's change in methodology for identifying similar merchandise in an antidumping proceeding is a rule to which Section 553 of the APA applies).

### 3. Whether Commerce's Surrogate Country Selection was Arbitrary and Capricious

### a. Parties' Contentions

Finally, Foshan Shunde argues that Commerce acted arbitrarily and capriciously by finding India economically comparable to China in other administrative reviews with the same POR, yet chose Indonesia in this review.  It relies on <u>JTEKT Corp. v. United States</u> ("<u>JTEKT I</u>") in which the court held Commerce's decision to postpone implementing its new position on freight allocations impermissibly arbitrary because Commerce applied the decision to all respondents except one.  33 CIT ___, ___, 675 F. Supp. 2d 1206, 1239-1240 (2009).  In support, Foshan Shunde provides the following list of annual reviews for the 2009-2010 POR where Commerce included India on the surrogate country list:  <u>Folding Metal tables and Chairs from the People's Republic of China</u>, 76 Fed. Reg. 66,036 (Dep't of Commerce Oct. 25, 2011) (final results); <u>Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China</u>, 77 Fed. Reg. 2271 (Dep't of Commerce Jan. 17, 2012) (final results); <u>Steel Nails</u>; and <u>Fresh Garlic from the People's Republic of China</u>, 77 Fed. Reg. 34,346 (Dep't of Commerce June 11, 2012) (final results).  Pl.'s Br. at 12.

Foshan Shunde places particular emphasis on <u>Steel Nails</u> because that review shared the same initiation notice with <u>Ironing Tables</u>."  <u>Id.</u> at 12-13 (citing <u>Notice of Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 75 Fed. Reg. 60,076 (Dep't of Commerce Sept. 29, 2010).  In <u>Steel Nails</u>, Commerce requested the surrogate country list from its Office of Policy on January 31, 2011.  In contrast, Foshan

Shunde argues that because Commerce, in this proceeding, requested the list on June 8, 2011, it was untimely. [2]  Pl.'s Br. at 13.

Defendant responds that Plaintiff's claim of disparate treatment "disregards the evidence on the record of this proceeding in wholesale fashion."  Def.'s Br. at 7. Defendant maintains that when the Surrogate Country List was issued, India was no longer economically comparable to China.   "Rather than dispute this crucial fact, Foshan Shunde merely points to other antidumping cases in which World Bank data available at that time demonstrated that India was economically comparable to China." Id. at 8 (citing Pl.'s Br. at 12).  Defendant argues that all the administrative reviews cited by Foshan Shunde used the 2010 World Bank data—the then most contemporaneous report; however, this review used the 2011 data—the then most contemporaneous report.  Id. at 8.  As noted above, Defendant again argues that the surrogate selection was a fact-based determination, not a policy choice.   Therefore, according to Defendant, Commerce's surrogate country selection was in accordance with law.

## b. Analysis

Commerce's surrogate country determination is not arbitrary or capricious.  An "agency action is arbitrary when the agency offers[s] insufficient reasons for treating similar situations differently."  Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 57 (1983)).  For example, in JTEKT I the court faulted Commerce for

---

[2] The court notes that the record reflects that, June 8, 2011, is the date of the Surrogate Country List and not when Commerce requested the Office of Policy to create that list. See Preliminary Results.

treating one respondent differently than the others without providing sufficient explanation for the disparate treatment.   33 CIT ___, 675 F. Supp. 2d. 1206.   Here, however, Commerce has provided an explanation for selecting Indonesia in this review, but not in the other contemporaneous reviews.   As explained below, the factual information of the other administrative reviews (the available GNI data) varied from the instant administrative review.

The timing of the other reviews were such that the most contemporaneous World Development Report was the 2010 report, whereas when Commerce analyzed the different GNIs in this review, the more recent 2011 report had become available. See Decision Memorandum at 6.   In essence, Foshan Shunde argues that it was unreasonable for Commerce to use the information that is the most recent and contemporaneous to the POR because it contained a lower Indian GNI than the 2010 report. Commerce has an established practice of relying on the most current annual issue of the World Development Report, and this review did not deviate from that practice. Id.   Commerce is statutorily tasked with using the "best available" information and is given broad discretion to determine what constitutes the best available information.   19 U.S.C. § 1677b(c)(1); Peer Bearing Co.-Changshan v. United States, 27 CIT ___, ___, 298 F. Supp. 2d 1328, 1336 (2003).   Its reliance on the more recent 2011 World Development Report, whose data is more contemporaneous to the POR, is well within that mandate.   As Defendant correctly states, Foshan Shunde "is not entitled to have the Court remand the case to Commerce with instructions to disregard evidence that India and China are no longer economically comparable and instead base its

decision on an obsolete "practice" of finding India comparable."  Def.'s Br. at 9 (citing Pl.'s Br. at 9-11).   Accordingly, the court sustains Commerce's surrogate country selection.[3]

## B. Surrogate Valuation for Steel Wire Input

Foshan Shunde proposed subheading 7217.10.1000 of the Indian Harmonized Tariff Schedule ("HTS") for Commerce's valuation of its steel wire input.   Foshan Shunde SV (Surrogate Value) Submission for Prelim., PD 41.[4]   However, after the Preliminary Results in which Commerce selected Indonesia as the surrogate country, Foshan Shunde submitted Indonesian HTS 7217.10.1000 for its steel wire valuation. Indonesian HTS 7217.10.1000 has a carbon content threshold of less than 0.25 percent.   Foshan Shunde SV Submission for Final, PD 10-13.   HPI proposed Indonesian HTS 7217.10.3900 as the proper surrogate value for the steel wire input. Indonesian HTS 7217.10.3900 has a carbon content threshold of less than 0.6 percent. HPI SV Submission, PD 9 (Sept. 27, 2011).   In the Final Results, Commerce valued Foshan Shunde's steel wire under Indonesian HTS 7217.10.3900:

> We continue to find that HTS classification 7217.10.3900, which covers "steel wire not coated or plated, containing 0.6% or more carbon" constitutes the best available information for valuing steel wire in these Final Results.  Foshan Shunde's production records do not distinguish the

---

[3] In its reply brief Foshan Shunde raises a new argument that Commerce's use of GNI to determine economic comparability constitutes an unreasonable interpretation of the antidumping statute under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  This new legal argument is not appropriate for a reply brief and should have been raised in Plaintiff's opening brief.  The court therefore deems the issue waived.  See Scheduling Order at 6, May 18, 2012, ECF No. 22 ("The reply brief must be confined to rebutting arguments contained in the response brief.  The reply brief may not introduce new arguments.").

[4] "PD" refers to a document in the public administrative record.

<u>carbon content of its steel wire inputs or record the carbon content</u>
<u>contained in its steel wire</u>.  Therefore, we disagree with Foshan Shunde
that HTS classification 7217.10.3900 is an inappropriate value because it
covers a higher carbon content than Foshan Shunde's proffered HTS
value from India.  Accordingly, in these final results, we have continued to
use HTS classification 7217.10.3900 to value carbon steel wire.

<u>Decision Memorandum</u> at 13 (emphasis added).

## 1. Parties Contentions

Foshan Shunde argues that Commerce's valuation of its steel wire input under
Indonesian HTS 7217.10.3900 is unreasonable (unsupported by substantial evidence),
and that "this Court [should] remand this issue with instructions to [Commerce] to
recalculate [its] steel wire input applying the Indonesian import values for HTS
7217.10.1000."  Pl.'s Br. at 25.  Foshan Shunde contends that its steel wire is
composed of low carbon steel and should have been valued under Indonesian HTS
7217.10.1000, containing 0.25 percent carbon, as opposed to Commerce's valuation
under Indonesian HTS 7217.10.3900, which contains the higher 0.6 percent carbon
content.

Defendant responds that Foshan Shunde did not exhaust its administrative
remedies and is presenting new arguments not made before the agency.  Accordingly,
Defendant asks the court to sustain Commerce's determination.  Defendant claims that
Foshan Shunde is now arguing that Commerce should have used low rather than high
carbon steel data, but failed to present this argument at the administrative level.
Defendant explains that "in the proceeding below Foshan Shunde failed to meaningfully
advance such an argument; rather it addressed steel wire in one paragraph, noting that
no party had rebutted its proffered low carbon steel surrogate values from India and that

common sense supported its argument."  Def.'s Br. at 12-13 (citing Foshan Shunde's

Admin. Case Br. at 51, PD 22).  Defendant further contends that Foshan Shunde did not

provide any evidence at the administrative level that would support its new argument.

Id. at 13.  Defendant-Intervenor supports Defendant's exhaustion argument and argues

that Commerce's surrogate value selection is reasonable.

### 2. Analysis

The court does not believe that Defendant and Defendant-Intervenor's

exhaustion arguments have any merit.  Foshan Shunde articulated in its administrative

case brief why it believed Indonesian HTS 7217.10.1000 was the only reasonable

surrogate value choice on the administrative record.  See Foshan Shunde Admin. Case

Br. at 51 ("As a matter of common sense, this common household product has no

special requirement for high tensile strength high carbon steel wire, and petitioner has

offered not a shred of documentary evidence that it does.").  It therefore properly

exhausted its administrative remedies.

Turning to the merits, as noted above, when valuing factors of production in a

non-market economy proceeding, Commerce must use the "best available information"

when selecting surrogate data.  19 U.S.C. § 1677b(c)(1), (4).  Here, Commerce chose

Indonesian HTS 7217.10.3900 as the "best available information" to value Foshan

Shunde's steel wire inputs.  The court agrees with Foshan Shunde that this selection is

potentially unreasonable.  Foshan Shunde challenges Commerce's valuation "because

[Commerce] failed to consider all of the pertinent record evidence with regard to Foshan

Shunde's surrogate value for steel wire."  Pl.'s Br. at 21.  Specifically, Foshan Shunde

claims that Commerce "failed to consider the surrogate value for low-carbon steel wire based on Indonesian import data that Foshan Shunde placed on the record of this case in its surrogate value submission for the final results." Id.  Foshan Shunde adds that it "has stated positively on the record of this case that the steel wire that it consumes is appropriately classified under Indonesian HTS No. 7217.10.1000, which corresponds to low carbon wire."  Id. at 25; see also Pl.'s Reply Br. at 8, ECF No. 36 ("Foshan Shunde fact certified, under potential criminal penalties, that it consumed low carbon wire.").

In the Decision Memorandum Commerce failed to review, compare, and explain the two proffered Indonesian data sources, focusing instead on a meaningless comparison between HPI's proffered Indonesian data source and a moot Indian data source: "we disagree with Foshan Shunde that HTS classification 7217.10.3900 is an inappropriate value because it covers a higher carbon content than Foshan Shunde's proffered HTS value from India."  Decision Memorandum at 13 (emphasis added). Commerce needs to review, compare, and explain why HPI's proffered Indonesian surrogate data is preferable to Foshan Shunde's submitted Indonesian surrogate value as the best available information.  To provide additional guidance and context, the court is struggling to understand why it is reasonable on this administrative record to assume that Foshan Shunde's steel wire inputs actually have higher carbon content than Foshan Shunde's proffered Indonesian HTS category, especially when read against Foshan Shunde's disputation of HPI's higher carbon content category: "[a]s a matter of common sense, this common household product has no special requirement for high tensile strength high carbon steel wire, and petitioner has offered not a shred of

documentary evidence that it does."  Foshan Shunde Admin. Case Br. at 51.  Absent

verification of the carbon content of Foshan Shunde's inputs, the court cannot

understand the reasonableness of assuming a higher carbon content on this

administrative record.  This is especially difficult to comprehend given Commerce's prior

choices for steel valuation when India was the surrogate country.  Likewise, the court

searched HPI's submissions for some explanation that ironing board manufacturers

typically use higher content carbon steel, but could not find an explanation.

Commerce's inference about the appropriate Indonesian HTS data source does not

appear reasonable on this administrative record.  Perhaps there is some reasonable

explanation justifying Commerce's surrogate value choice for steel wire inputs.  In any

event, Commerce needs to explain why HPI's proffered Indonesian HTS category is

preferable to Foshan Shunde's, and to also explain why it is reasonable to infer/assume

from the administrative record that a household item like an ironing board requires

higher carbon content.  The court therefore will remand this issue to Commerce for

further consideration.

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that Foshan Shunde's challenge to Commerce's practice of zeroing

is stayed pending a decision on the issue from the U.S. Court of Appeal for the Federal

Circuit; it is further

**ORDERED** that Foshan Shunde's challenges to Commerce's financial statement

selection and surrogate valuation of brokerage and handling are stayed pending a final

disposition of those issues in <u>Since Hardware (Guangzhou) Co. v. United States</u>, Consol. Court No. 11-00106; it is further

**ORDERED** that Commerce's surrogate country selection is sustained; it is further

**ORDERED** that Commerce's steel wire valuation is remanded to Commerce to reconsider its selection of a surrogate value for Foshan Shunde's steel wire input; it is further

**ORDERED** that Commerce shall file its remand results on or before April 9, 2013; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

                                                            /s/ Leo M. Gordon
                                                         Judge Leo M. Gordon

Dated:    February 22, 2013
          New York, New York