Slip Op. 16-1

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| FOSHAN SHUNDE YONGJIAN HOUSEWARES & HARDWARES CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Leo M. Gordon, Judge <br><br> Court No. 12-00069 |

**OPINION and ORDER**

[Results on redetermination sustained in part and remanded in part.]

Dated: January 8, 2016

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, deKieffer & Horgan PLLC, of Washington, DC for Plaintiff Foshan Shunde Yongjian Housewares & Hardwares Co., Ltd.

Michael D. Snyder, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States. With him on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Amanda T. Lee, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

Frederick L. Ikenson and Larry Hampel, Blank Rome LLP of Washington, DC for Defendant-Intervenor Home Products International, Inc.

Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") sixth administrative review of the antidumping duty order covering Floor-Standing, Metal-Top Ironing Tables from China. See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 77 Fed. Reg. 14,499 (Dep't of Commerce Mar. 12, 2012) (final results admin. review) (Final Results); see also Issues and Decision Memorandum for Final Results of Antidumping Duty

Administrative Review of Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, A-570-888 (Dep't of Commerce Mar. 5, 2012), available at http://enforcement.trade.gov/frn/summary/prc/2012-5915-1.pdf (last visited this date) ("Decision Memorandum"). Before the court are the Final Results of Redetermination, ECF No. 64 ("Remand Results") filed by Commerce pursuant to Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States, 37 CIT ___, 896 F. Supp. 2d 1313 (2013) ("Foshan I"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012). Familiarity with Foshan I is presumed.

Foshan Shunde challenges several aspects of the Remand Results: (1) Commerce's use of a provision in the Harmonized Tariff Schedule ("HTS") that includes high-carbon steel to value its steel wire input; (2) Commerce's use of the World Bank's Doing Business 2010: Indonesia publication to value Foshan Shunde's brokerage and handling ("B&H"), or in the alternative, Commerce's failure to adjust the World Bank data to reflect Foshan Shunde's actual experience; and (3) Commerce's application of zeroing. Pl.'s Comments on Remand Redetermination (June 5, 2015), ECF No. 70 ("Pl.'s Br."); see also Def.'s Resp. to Pl.'s Comments to the Remand Redetermination (Aug. 7, 2015), ECF No. 77 ("Def.'s Resp."); Def.-Intervenor's Resp. to Pl.'s Comments to the Remand Redetermination (Aug. 13, 2015), ECF No. 79; Letter from Gregory S. Menegaz,

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

attorney for Plaintiff, to the Hon. Leo M. Gordon, Judge (Aug. 13, 2015), ECF No. 80 (letter correcting factual misstatement).

## I. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2015). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances

presented by the whole record." 8A West's Fed. Forms, National Courts § 3:6 (5th ed. 2015).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Steel Wire Surrogate Value

In Foshan I the court remanded to Commerce to further consider the surrogate value for Foshan Shunde's steel wire input. Foshan I, 37 CIT at ___, 896 F. Supp. 2d at 1326-28. During the administrative review Commerce had three choices. Foshan Shunde proposed a relatively lower cost surrogate value derived from Indonesian HTS 7217.10.10 ("Containing by weight less than 0.25% of carbon"), a category assigned to low carbon steel wire. Home Products International, Inc. ("HPI"), the petitioner, proposed a relatively higher cost surrogate value derived from Indonesian HTS 7217.10.39 ("Containing by weight 0.6% or more of carbon"), a category assigned to high carbon steel wire. Conf. J.A. at JA002672-73 (Feb. 15, 2015), ECF Nos. 37-39 (HPI's brief in rebuttal to Foshan Shunde's administrative case brief) ("J.A."). HPI also suggested, as an alternative, a surrogate value derived from the six-digit basket category, Indonesian HTS 7217.10 ("Wire of iron or non-alloy steel"), which encompassed both of the other two proposed

categories. Id. at JA002673 ("[Commerce] may consider it appropriate to broaden the surrogate value classification beyond the sublevels reflecting carbon content and simply base the value on data reflecting Indonesian imports at the 6-digit level.") (HPI's administrative rebuttal brief).

The Indonesian "carbon" metric posed an issue because the administrative record, through no fault of Foshan Shunde, did not identify the carbon content of Foshan Shunde's steel wire inputs. HPI acknowledged that the absence of record information was not the result of "a shortcoming of [Foshan Shunde's] production records system." See id. Foshan Shunde did not capture that information in its production records, and as one can infer from HPI's concession, it is not something about which an ironing board manufacturer appears to care. Commerce therefore had to choose the "best available" surrogate value based on incomplete information, or more simply, a lack of direct information about the carbon content of Foshan Shunde's steel wire input.

The surrogate value for the steel wire input was not an issue in the prior administrative review in which India was the surrogate country. Commerce used Indian HTS 7217.10.10. India, though, unlike Indonesia, categorizes its additional subheadings under HTS 7217.10 according to wire thickness, not carbon content. Foshan Shunde, nevertheless, argues that Indonesian HTS 7217.10.10 is a logical, if not comparable, surrogate selection given the past selection of Indian HRS 7217.10.10. HPI argued, and Commerce agreed, however, that no direct concordance exists between the diameter-based provisions of the Indian tariff schedule and the carbon-based provisions of the Indonesian schedule. Remand Results at 17-18.

Court No. 12-00069                                                                                                Page 6

In the Final Results Commerce chose the relatively higher cost, higher carbon surrogate value for Foshan Shunde's steel input. Decision Memorandum at 13. When subsequently challenged by Foshan Shunde, the court found persuasive Foshan Shunde's argument made before Commerce that ironing boards do not require the higher cost steel input Commerce selected: "As a matter of common sense, this common household product has no special requirement for high strength high carbon steel wire . . . ." J.A. at JA002593 (Foshan Shunde's administrative case brief). The court remanded the issue to Commerce and asked why "it is reasonable to infer/assume from the administrative record that a household item like an ironing board requires higher carbon content." Foshan I, 37 CIT at ___, 896 F. Supp. 2d at 1327-28.

On remand, Commerce replaced the higher cost, high carbon surrogate value with a surrogate value derived from the broader six-digit HTS subheading 7217.10 that includes both high carbon and low carbon steel wire. Remand Results at 17. Commerce concluded, "while the record establishes that Foshan Shunde consumed steel wire in the production process, there is nothing on the record of this proceeding that establishes the particular carbon content of the steel wire that Foshan Shunde used." Id. at 8. As further justification, Commerce noted that Foshan Shunde had failed to demonstrate that the administrative record supported its claims that it used only low carbon steel wire as its input. Id. at 7-8.

These conclusions, however, still do not, in the court's view, provide a reasoned basis for Commerce's choice of a surrogate value that includes some high carbon steel for Foshan Shunde's steel wire inputs. More specifically, the conclusions do not provide

a reasonable basis to infer that Foshan Shunde, or any ironing board manufacturer for that matter, would choose to source higher cost, high carbon steel wire inputs to make ironing boards. The court still does not understand how a reasonable mind would include those higher cost inputs as surrogate values. Neither Commerce nor HPI has explained why an ironing board manufacturer requires higher cost, high carbon inputs. This is not an adverse facts available situation in which Foshan Shunde withheld information or failed to cooperate. Foshan Shunde offered a common sense explanation in lieu of direct evidence of the actual carbon content of its steel inputs, which everyone concedes was not knowable. As HPI itself stated in its administrative rebuttal brief, "the record does not reflect the necessary specification (carbon content) but not through a shortcoming of the respondent's production records system." J.A. at JA002673.

HPI could have buttressed its preferred inferences about Foshan Shunde's potential use of higher cost, higher carbon steel wire with HPI's own declarations demonstrating that ironing board manufacturers typically use higher cost, higher carbon steel wire, or that they typically use a mixture of high carbon and low carbon steel wire. Without that informational proffer, however, it is difficult for the court to conceive a reasonable mind disregarding the common sense intuition that an ironing board manufacturer simply does not require higher cost, higher carbon steel wire, and would therefore logically favor the lower cost input. "Occasionally, even in the law, common sense must prevail." Wind Tower Trade Coal. v. United States, 741 F.3d 89, 99 (Fed. Cir. 2014).

Without a reasonable explanation supporting Commerce's inference that Foshan Shunde would have sourced the relatively higher cost, high carbon steel wire to manufacture its ironing boards, the court holds that the relatively lower cost, low carbon surrogate value derived from Indonesian HTS subheading 7217.10.10 is the only surrogate value on this administrative record that a reasonable mind would select as the best available information for Foshan Shunde's steel wire input. Accordingly, the court remands this issue to Commerce to use HTS subheading 7217.10.10 to calculate Foshan Shunde's steel wire input.

### B. Brokerage and Handling

Foshan Shunde challenges Commerce's calculation of its B&H. This has become a well-worn issue in the administrative reviews of the ironing board antidumping order. The issue resulted in four remands from this Court covering the fifth administrative review. In a series of decisions in that action, most notably Since Hardware (Guangzhou) Co. v. United States, 38 CIT ___, 37 F. Supp. 3d 1354 (2014) ("Since Hardware IV") and Since Hardware (Guangzhou) Co v. United States, 38 CIT ___, 977 F. Supp. 2d 1347, vacated in part after remand, 38 CIT ___, 37 F. Supp. 3d 1354 ("Since Hardware III"), the court and the parties came to a fuller understanding of the World Bank's Doing Business 2010 series of publications, the source for Commerce's B&H surrogate value selection in the fifth administrative review. Commerce turned to Doing Business 2010 again in this administrative review (and Remand Results), but used Indonesian data. See Foshan I, 37 CIT at ___, 896 F. Supp. 2d at 1323 (sustaining Commerce's selection of Indonesia as the primary surrogate country). Foshan Shunde challenges Commerce's use of the

Court No. 12-00069                                                                                              Page 9

Doing Business data over other sources in the record and in the alternative seeks adjustments to the Doing Business data points to conform with other evidence on the record.

      The Doing Business 2010 series compares the costs of doing business in 183 different economies based on surveys of local companies. The survey data are compiled into the costs a hypothetical business would incur when undertaking various activities in an economy. B&H costs in particular are aggregated as those a hypothetical medium-sized business located within an economy's largest city would incur when exporting merchandise in a single 20-foot shipping container. The Doing Business 2010: Indonesia data point is thus the cost a hypothetical business in Indonesia's largest city, Jakarta, might incur when exporting a single 20-foot shipping container as derived from survey responses from companies all over Indonesia. See J.A. at JA1394-412.

      The Doing Business 2010: Indonesia B&H figure consists of three relevant components:

| | |
|---|---|
| Document Preparation Fees | $210 |
| Customs Clearance Fees | $169 |
| Ports & Terminal Handling Charges | $165 |
| Total | $544 |

Remand Results at 9. Commerce doubled these amounts to reflect Foshan Shunde's use of 40-foot containers rather than the 20-foot containers presumed in the World Bank's surveys. Id.

      Foshan Shunde first argues that Commerce's selection of the Doing Business 2010: Indonesia data is unreasonable because the data comes from survey responses describing hypothetical costs. Pl.'s Br. at 7-10. The court does not agree. Commerce in

the Remand Results explained that Doing Business 2010: Indonesia meets its announced surrogate value selection criteria. Specifically, the Doing Business 2010 data is sourced from the primary surrogate country and "reflect the experience of a broad number of exporters, are publicly available, specific to the costs in question, represent a broad market average, and are contemporaneous to the [period of review]." Remand Results at 12-13. Commerce reasonably found that Foshan Shunde's proffered alternative sources were inferior to the Doing Business 2010 data when measured against those same criteria. Specifically, Foshan Shunde's alternative data are from individual, mostly non-Indonesian freight forwarding companies, which represent less of a broad market average and are not sourced from the primary surrogate country. Foshan Shunde's Indonesian data similarly fall short of the Doing Business source because they are from individual companies and cover only portions of the total B&H cost. See Remand Results at 12-14. Commerce's conclusion that the World Bank data represent the "best available" data to value Foshan Shunde's B&H costs is therefore reasonable.

Foshan Shunde next argues that Commerce should have altered the World Bank data to reflect Foshan Shunde's actual experience. Pl.'s Br. at 10-16. Specifically, Foshan Shunde argues that Commerce should subtract $255 for letter of credit preparation fees because Foshan Shunde did not actually incur that cost. Id. at 11-13. Foshan Shunde points to correspondence from a World Bank staffer indicating that the $210 document preparation component of the Doing Business data point includes the cost of procuring a letter of credit. The court, though, agrees with Defendant that Commerce's refusal to subtract the $255 letter of credit fee was reasonable. The document preparation

component of the Doing Business data point is an aggregate figure that includes costs for the preparation of numerous documents. Foshan Shunde identifies no evidence to indicate what segment of the $210 document preparation cost is attributable to obtaining a letter of credit. As Commerce reasonably explained, "without knowing the exact breakdown of the data included in the World Bank report, and how the business practices of this broad pool of companies relate to the business practices of Foshan Shunde, the Department can no more deduct a letter of credit expense, or remove elements of document and preparation charges, than it can add extra expenses which Foshan Shunde incurred but which are not reflected by the World Bank data." Remand Results at 24. The court therefore sustains Commerce's refusal to subtract Foshan Shunde's suggested letter of credit fee from the Doing Business data point.

Foshan Shunde also argues that Commerce unreasonably doubled the Doing Business data point (and, by extension, each component of that data point) to reflect Foshan Shunde's use of 40-foot containers instead of 20-foot containers as described in the World Bank's surveys. The court agrees.

Commerce states that it could "find no record evidence in this redetermination establishing that a 100 percent proportionate increase in shipments between a 20-foot and 40-foot container is unreasonable." Remand Results at 11. Foshan Shunde, though, identified several record documents demonstrating that ports and terminal handling fees do not increase proportionally with container size and that document preparation fees do not increase at all with container size. Specifically, Foshan Shunde cites a document indicating that the Indonesian Government limits ports and terminal handling fees to $95

for 20-foot containers and $145 for 40-foot containers, as well as price quotes from an Indonesian freight forwarder appearing to corroborate these figures. The court therefore wonders how Commerce could reasonably assume that ports and terminal handling fees increase proportionally with container size if, as the record appears to demonstrate, the Indonesian Government sets fees at levels that do not. See Remand Results at 14, 22-25. Commerce relies on ports and terminal handling fees in other countries that show less than proportionate increases. Commerce's reliance on this data, however, does not support an inference or assumption that such fees in Indonesia rise proportionately with container size. See id. at 14-15 (attempting to justify a 100 percent increase for the Indonesian data point by reference to data for other countries that "range from 67 percent to 84 percent" as well as a suggested calculation from the domestic interested party yielding a "93 percent higher rate"). Quite the opposite. That sort of "reasoning" is, in the court's view, unreasonable.

   Next, Foshan Shunde identifies a quote for obtaining a letter of credit from an Indonesian bank that does not depend on container size, as well as correspondence from a World Bank official indicating that letter of credit costs are included within the document preparation component of the Doing Business 2010: Indonesia data point. Foshan Shunde also identifies a report from the Association of Southeast Asian Nations Secretariat describing fees for the preparation of bills of lading assessed on a per-document basis. The fees for two of the documents in the document preparation component do not increase proportionally with container size, which should preclude a reasonable mind from "assuming" that the total document preparation component

increases proportionally with container size. See id. at 22-25.

The court understands that Foshan Shunde utilized 40-foot containers and that the Doing Business 2010: Indonesia study described the hypothetical costs of shipping goods in 20-foot containers. Commerce chose to alter the Doing Business data point to reflect that difference, but did so without explaining what relationship (if any) exists between the Doing Business data point and container size. With Foshan Shunde's demonstration that two of the three components do not increase proportionally with container size, the court cannot sustain Commerce's approach. Cf. Remand Results at 24 (rejecting Foshan Shunde's proposed alteration because Commerce could not determine "the exact breakdown of the data included in the World Bank report, and how the business practices of this broad pool of companies relate to the business practices of Foshan Shunde"). The court therefore remands the B&H issue for Commerce to reconsider its alteration of the Doing Business 2010: Indonesia figure.

### C. Zeroing

Foshan Shunde challenges Commerce's application of zeroing in this administrative review. The court stayed resolution of this issue pending the Court of Appeals for the Federal Circuit's ("Federal Circuit") decision in Union Steel v. United States, 713 F.3d 1101 (Fed. Cir. 2013), and then pending this Court's decision in Since Hardware IV. See Foshan Shunde Yongjian Housewares & Hardwares Co. v. United States, Ct. No. 12-00069, at 1-2 (CIT Aug. 22, 2013), ECF No. 55 (order continuing stay). The Federal Circuit in Union Steel affirmed Commerce's practice of zeroing in administrative reviews as a reasonable interpretation of a silent statutory provision under

Chevron. The court in Since Hardware IV concluded that the reasoning in Union Steel, a market economy case, also applied in the non-market economy setting and as a consequence also held Commerce's use of zeroing to be reasonable under Chevron. Familiarity with the background and holdings on the issue of zeroing in those cases is presumed.

  Foshan Shunde's arguments here are similar to those it made in Since Hardware IV, focusing on the difference between Commerce's application of the average-to-transaction ("A-to-T") methodology in market economy reviews as compared to non-market economy reviews. As Foshan Shunde explains, Commerce in market economy reviews uses monthly average normal values, so that the "A" in the "A-to-T" comparison changes with each month covered in the period of review. In non-market economy reviews, however, Commerce uses one average normal value, so that the "A" in the "A-to-T" comparison does not change at all. According to Foshan Shunde, the single average value produces a "less accurate" and "less reasonable" comparison, and therefore renders Commerce's application of zeroing in non-market economy reviews unreasonable. Pl.'s Br. at 22. Foshan Shunde adds that Commerce "offered no explanation" for its conclusion in the Remand Results, "merely relying on prior case decisions and not addressing Foshan Shunde's arguments." Id. at 24.

  The court is not convinced. Foshan Shunde develops its argument by comparing the market economy and non-market economy versions of A-to-T. The question of whether Commerce's application of A-to-T yields more accurate results in the market economy setting as compared to the non-market economy setting, however, is not as

critical as Foshan Shunde insists. The issue before the Union Steel court was the reasonableness of Commerce's justification for zeroing in administrative reviews but not investigations. Union Steel, 713 F.3d at 1107-09. That explanation turned on the differences in Commerce's application of A-to-T rather than average-to-average ("A-to-A") in administrative reviews. Union Steel, 713 F.3d at 1107-09. Through that lens, the Federal Circuit concluded that Commerce's practice of zeroing when applying A-to-T "better reflect[s] the results of each average-to-transaction comparison" because "zeroing reveals masked dumping," and that zeroing therefore "reasonably reflects unique goals in differing comparison methodologies." Id. at 1109.

When using A-to-T in the non-market economy setting, Commerce gains the same kind of comparative advantage over A-to-A because it uses individual transaction prices instead of average transaction prices. Remand Results at 16. This is why, in the court's view, Union Steel applies in the non-market economy setting. See Since Hardware IV, 38 CIT at ___, 37 F. Supp. 3d at 1361-63. And although Foshan Shunde may be able to show that A-to-T in the market economy context yields more accurate results than A-to-T in the non-market economy context, Foshan Shunde has not demonstrated that that Commerce's non-market economy practices eliminate the comparative advantage A-to-T has over A-to-A more generally. See Pl.'s Br. at 20-24. The court therefore concludes that Commerce's application of zeroing here is reasonable under Chevron. See Union Steel, 713 F.3d at 1107-09.

The court also does not agree with Foshan Shunde that Commerce did not provide an explanation. Commerce in the Remand Results noted that "zeroing can increase

accuracy and reveal potential masked dumping," and that both Union Steel and Since Hardware IV support its position. Remand Results at 16, 26. This explanation, though short, is reasonable. See NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1321-22 (Fed. Cir. 2009) (The court must sustain a determination "'of less than ideal clarity'" where Commerce's decisional path is reasonably discernable. (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983))).

## III Conclusion

For the foregoing reasons, the court sustains the Remand Results with the exception of Commerce's surrogate value selection for steel wire and Commerce's adjustment of the documents preparation and ports and terminal handling components of the Doing Business 2010: Indonesia data point.

Accordingly, it is hereby

**ORDERED** that Commerce on remand use Indonesian HTS 7217.10.10 to calculate Foshan Shunde's steel wire input; it is further

**ORDERED** that Commerce on remand clarify or reconsider its adjustment of the Doing Business 2010: Indonesia data point for use as the surrogate value for brokerage and handling; it is further

**ORDERED** that Commerce shall file its remand results on or before March 8, 2016; and it is further

Court No. 12-00069          Page 17

      **ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page/word limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

                                                  <u>/s/ Leo M. Gordon</u>
                                                Judge Leo M. Gordon

Dated:   January 8, 2016
          New York, New York